UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

DONALD O. STAFFORD, MARIE L. OLSON, )
ROBERT P. COURTNEY, MYRON CLARK,   )
and RUSSELL CHORPENNING, individually  )
and on behalf of all others similarly situated,   )
           Plaintiffs,                                    )
                                             )
      vs.                                                    )        1:02-cv-1132-LJM-WTL
                                             )
DENNIS B. BAKKE, ROGER W. SANT,     )
BARRY J. SHARP, AES CORP., JOHN R.    )
HODOWAL, RAMON L. HUMKE, and        )
JOHN R. BREHM,                                        )
            Defendants.                                  )

**ORDER ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

       This cause is now before the Court on defendants', Dennis B. Bakke, Roger W. Sant, Barry

J. Sharp (collectively,"Individual Defendants"), and AES Corporation (all defendants, "AES

Defendants"), Motion for Judgment on the Pleadings on the remaining claims against them.  By

order dated November 17, 2004 ("November 2004 Order"), this Court dismissed many of the

plaintiff's, Donald O. Stafford, Marie L. Olson, Robert P. Courtney, Myron Clark, and Russell

Chorpenning (collectively, "Plaintiffs"), allegations against AES Defendants, however, claims for

violation of Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l* and 77o,  remain to

the extent Plaintiffs allege AES Defendants made misrepresentations or material omissions in the

Registration Statement and Prospectus for purposes of a Share Exchange Agreement regarding

AES's default on a contract with Williams Energy Services Co. ("Williams") in the fall of the year

2000 remain.  AES Defendants contend that based on the complaint and answer filed in this cause,

the Court should dismiss these remaining allegations because the absence of loss causation is

established by the pleadings.  Plaintiffs aver that AES Defendants' reliance on the pleadings to prove

an element of their affirmative defense is improper and the Court should deny the motion for that

reason.  Alternatively, Plaintiffs argue that the Court should construe AES Defendants' instant

motion as an untimely attempt to seek reconsideration of the Court's November 2004 Order.

For the following reasons, the Court **GRANTS** AES Defendants' Motion for Judgment on

the Pleadings.

## I.  <u>BACKGROUND</u>[1]

### A.  THE SHARE EXCHANGE

Plaintiffs have alleged a variety of security violations by AES Defendants arising from a

transaction that occurred in March 2001.  On March 27, 2001, Plaintiffs exchanged their shares of

IPALCO common stock for AES common stock in connection with a tender offer, pursuant to a

Registration Statement dated August 16, 2000, as amended, and pursuant to a Proxy

Statement/Prospectus dated September 8, 2000.  Compl. ¶¶ 4, 5, 11.

Among other things, the Amended Class Action Complaint alleges that the Registration

Statement and Proxy Statement/Prospectus include statements to the effect that AES's business was

well-run and that AES was well-financed.  *Id.* ¶ 30.  Specifically, the SEC filing stated that AES

> [c]onduct[ed] its business and operations only in the ordinary course in substantially
> the same manner as previously conducted, use all reasonable efforts to preserve intact
> its current business organization, keep available the services of its current officers
> and employees and maintain its relationships with customers, suppliers, licensors,
> licensees, distributors and others having business dealings with it, including
> regulators, to the end that its goodwill and ongoing business will be unimpaired at

---

[1]The majority of the facts contained herein are taken from the Court's November 2004
Order.  Additional facts from AES Defendants' answer are incorporated as appropriate.

the effective time . . . .

*Id.* (alteration by the Court).  The SEC filings also stated that AES would

> promptly notify IPALCO of any representation or warranty made by AES that is qualified as to materially becoming untrue or inaccurate or any representation or warranty that is not so qualified becoming untrue or inaccurate in any material respect, a material breach of any covenant or obligation of AES or any change or event that could have a material adverse effect.

*Id.*

Moreover, incorporated by reference into the Registration Statement and Proxy Statement/Prospectus, the Agreement and Plan of Share Exchange between AES and IPALCO, dated July 15, 2000, stated:

> Parent [AES] is not in breach or violation of or in default in the performance or observance of any term or provision of, and no event has occurred which, with lapse of time or action by a third party, could result in a default by Parent under (i) the Parent Charter or the Parent By-laws or (ii) any contract, commitment, agreement, indenture, mortgage, loan agreement, note, lease, bond, license, approval or other instrument to which it is a party or by which Parent is bound or to which any of its property is subject, except, in the case of clause (ii) above, for violations, breaches or defaults which individually or in the aggregate have not had and would not have a Parent Material Adverse Effect.

*Id.* ¶ 31.  Pursuant to Section 4.1 of the Agreement and Plan of Share Exchange dated July 15, 2000,

> The term "PARENT MATERIAL ADVERSE EFFECT" means an event, change, cause or effect which is materially adverse to the business, operations, properties, assets, liabilities, prospects, condition (financial or otherwise) or results of operations of Parent [AES] or the ability of Parent to consummate the Exchange and the transactions contemplated hereby.

*Id.* ¶ 33 n.1.

## B.  THE WILLIAMS CONTRACT

The only claims remaining in this cause relate to non-disclosure of information related to a

contract AES had with Williams Energy Services Co. ("Williams"). Since May 1998 AES had a Capacity Sale and Tolling Agreement ("Tolling Agreement") with Williams concerning certain power facilities in California, among other places. *Id.* ¶ 33. By the fall of 2000, AES had failed to comply with certain of its covenants in the Tolling Agreement. *Id.* In particular, AES had failed to honor its obligation to pay regulators for certain emissions credits that were required in connection with the Tolling Agreement. *Id.* ¶ 33.

By failing to make such payments, AES was in default of the Tolling Agreement. *Id.* ¶ 34. Williams tentatively excused this default and, apparently, upon further discussions with AES in the fall of 2000, finally decided to excuse it in its entirety. *Id.* Had Williams chosen not to excuse the default, AES would have faced serious financial problems. *Id.*

The Plaintiffs allege that the Defendants knew, or with reasonable diligence should have known, about the default and the subsequent dispute with Williams over whether or not it should be excused. *Id.* ¶¶ 43, 45, 53, 54, 61, 65, 69, 76. Therefore, AES Defendants were obligated to disclose the fact of the default because it could have been a Parent Material Adverse Effect.

## C. DISCLOSURES AND EVENTS AFTER THE SHARE EXCHANGE

As stated previously, the share exchange closed on March 27, 2001. *Id.* ¶ On September 25, 2001, AES announced "disappointing" financial results and disclosed numerous operational problems that caused an earnings shortfall. *Id.* ¶ 36. Among other things, AES attributed the earnings problems to shortfalls from Brazil and the United Kingdom, and the events of September 11, 2001. *Id.* However, a Merrill Lynch analyst reported on September 26, 2001, that weak United Kingdom power prices predated the events of September 11, 2001. *Id.* Following AES's

4

announcement on September 25, 2001, the price of AES shares declined from $24.50 per share on September 25, 2001, to $12.25 per share on September 26, 2001, on volume of over 52 million shares, an extraordinary volume for AES shares. *Id.*

After September 2001, AES announced its intention to divest itself of certain assets, including the Fifoots plant in the United Kingdom that it had earlier highlighted. *Id.* ¶ 37. In its release of its year-end 2001 results, AES disclosed for the first time that, as a result of purported price declines in the United Kingdom, including New Energy Trading Arrangements ("NETA"), "'virtually all generation facilities which do not have long-term contracts to sell their power have come under severe financial pressure and several have been taken offline or shut down . . . .'" *Id.* (quoting an unknown source). In a report on a Form 10-Q for the quarterly period ended March 31, 2002, AES also revealed for the first time that in the first quarter of 2001, Fifoots had an after-tax loss of $11 million. *Id.* In that same report on Form 10-Q, AES also announced additional write-offs for the Fifoots operation of $32 million. *Id.* This evidenced that AES's United Kingdom operations were severely impaired as a result of new pricing arrangements adopted in the United Kingdom prior to March 2001, and that the company lacked adequate long-term contracts or hedging arrangements to avoid a rapid decline in its United Kingdom operations. *Id.*

AES's 2001 report on Form 10-K, filed with the SEC on or about March 28, 2002, disclosed that AES had engaged in several secured equity-linked loan transactions ("SELLs"). *Id.* ¶ 38. These SELLs were transactions in which AES stock was used as collateral for a loan, and the amount of stock necessary to secure the loan increased in proportion to declines in the price of the stock. *Id.* In the March 28, 2002, Form 10-K, AES revealed that the extent of the SELLs was so great that as of March 29, 2002, AES would need to issue approximately 72 million shares of stock to repay the

loans. *Id.* The price of AES stock at the time was $9.00 per share, which equated to well over 100 million additional shares. *Id.* This announcement "subject[ed] AES shareholders to potentially massive dilution, . . . necessarily subjected AES stock to heightened volatility, causing declines in AES's stock price to become further exacerbated by the proportional security interest raised by the Company's debts." *Id.*

The price of AES shares steadily declined from the Offering price of $25.00 per share to approximately $10.00 per share in only a few months. *Id.* ¶ 40. The stock has continued to decline and as of the filing of the Amended Class Action Complaint was below $5.00 per share. *Id.*

The Plaintiffs contend that prior to the closing of the share exchange AES Defendants knew, or with reasonable diligence should have known, about the effect of NETA on AES's business, about the SELLS and about the volatility of AES stock as compared to IPALCO stock, and that AES Defendants should have disclosed them before they did. *Id.* ¶¶ 43, 45, 53, 54, 61, 65, 69, 76.

The Plaintiffs claim that AES and AES defendants issued, caused to be issued and participated in the issuance of the Registration Statement and Proxy Statement/Prospectus for the share offering. *Id.* ¶ 46. In addition, the Plaintiffs allege that AES and AES defendants failed to make a reasonable investigation or possess reasonable grounds for the belief that the statements in the Registration Statement and Proxy Statement/Prospectus were true, were without omissions of any material fact and were not misleading. *Id.* ¶ 45.

Furthermore, the Plaintiffs claim that AES solicited the share exchange by issuing the Proxy Statement/Prospectus, which contained untrue statements of material facts, omitted other facts necessary to make the statements not misleading, and concealed and failed to disclose other facts. *Id.* ¶ 53. The Plaintiffs also contend that AES failed in its duty to make a reasonable and diligent

investigation into the statements contained in the Offering materials, including the Proxy Statement/Prospectus, to insure that the statements were true and that there was no failure to omit a material fact required to be stated in order to make the statements contained therein not misleading. *Id.* ¶ 54.

The Plaintiffs claim that AES Defendants were control persons at AES and had a series of direct and/or indirect and/or personal relationships with other directors and/or major shareholders of AES. *Id.* ¶ 60. In addition, AES Defendants signed the Registration Statement and otherwise participated in the process that allowed the offering to close. *Id.* ¶ 61.

### D.  REMAINING CLAIMS

As to each of the Counts listed here, the only remaining material misrepresentation or omission that remains at issue is Plaintiffs' allegation that AES Defendants' failure to disclose the temporary default on the Williams contract caused them harm. Count I of the Amended Class Action Complaint alleges that AES and AES Defendants violated Section 11 of the Securities Act, 15 U.S.C. § 77k, when they allowed the Registration Statement and the Proxy Statement/Prospectus to issue with inaccuracies, untrue statements of material facts, and omissions of other facts necessary to make statements contained therein not misleading. *Id.* ¶ 43. Count II of the Amended Class Action Complaint alleges that AES violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), as the seller, offeror and or solicitor of sales of the shares offered pursuant to the September 8, 2000, Proxy Statement/Prospectus, which contained untrue statements of material facts, failed to state other facts necessary to make the statements not misleading, and concealed and failed to disclose other material facts, when AES was under a duty to make a reasonable and diligent

investigation of the accuracy and truth of the statements contained in the Offering materials. *Id.* ¶¶ 53, 54. Count III of the Amended Class Action Complaint alleges that AES Defendants violated Section 15 of the Securities Act, 15 U.S.C. § 77o, by controlling AES and participating in the violation of Section 11 of the Securities Act as alleged in Count I, by signing or otherwise participating in the process that allowed the Offering to be successfully completed. *Id.* ¶¶ 59-61.

## II. <u>STANDARD</u>

Rule 12(c) of the Rules of Civil Procedure provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." In considering a motion for judgment on the pleadings, the Court employs the same standard as that applied to a motion to dismiss under Rule 12(b). *See N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998). A motion will be granted only if it appears beyond a doubt that the non-movant cannot prove any facts that would support a claim for relief. *See N. Ind. Gun*, 163 F.3d at 452. In determining whether judgment on the pleadings is proper, the Court accepts as true all facts alleged in the complaint and draws all reasonable inferences from the pleadings in favor of the non-movant. *See Gillman v. Burlington N. Ry. Co.*, 878 F.2d 1020, 1022 (7th Cir. 1989).

## III. <u>DISCUSSION</u>

AES Defendants contend that the allegations of the complaint prove their absence of loss causation, an affirmative defense to Plaintiffs' Sections 11 and 12 violations. Moreover, the failure of Plaintiffs' Sections 11 and 12 claims defeat their Section 15 claim. Plaintiffs assert that dismissal

on the pleadings based on this affirmative defense is improper because AES Defendants must show what caused the price of AES shares to decline other than the cause plead by Plaintiffs.[2]

The Court finds that dismissal of Plaintiffs' claims on the basis of AES Defendants' affirmative defense of the absence of loss causation is proper under the circumstances plead in Plaintiffs' complaint.  The Court's prior ruling accounted only for "transaction causation," or "the investor would not have engaged in the transaction had the other party made truthful statements at the time required." *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.), *cert. denied* 488 U.S. 926 (1988).  "Loss causation," on the other hand, "means that the investor would not have suffered a loss if the facts were what he believed them to be . . . ." *Id.*  While the Plaintiffs' need not plead loss causation in their complaint for Section 11 or 12 claims, they have plead too much in that they have specifically cited that Williams excused the default and a Parent Material Adverse Effect never occurred.  In other words, the default could not have caused the stock price to fall after the Share Exchange because it was a non-event.  In addition, Plaintiffs have plead that other factors caused the loss after the Share Exchange, not any default on the Williams contract.  *See* Compl. ¶ 36 (discussing the disclosure of "disappointing" results in September 2001); *id.* ¶ 37 (discussing the significant losses at AES' United Kingdom Fifoots facility in the wake of the NETA regulations disclosed after the Share Exchange transpired and the subsequent closing of Fifoots).

---

[2]The defense reads:
> If the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement therein not misleading, such portion or all such damages shall not be recoverable.

15 U.S.C. §§ 77k(e), 77*l*(b).

9

Although the Court recognizes the unusual nature of the "negative defense" of the absence of loss causation in Section 11 and 12 claims, under the circumstances of this case, the pleadings themselves show that the stock value loss suffered by Plaintiff was not caused by the failure of the AES Defendants to disclose the default and subsequent excuse thereof on the Williams contract. Plaintiffs' Section 11 and 12 claims should be **DISMISSED** with prejudice.  Furthermore, because Plaintiffs have no underlying securities violation to support their Section 15 claim, that claim should also be **DISMISSED** with prejudice.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendants', Dennis B. Bakke, Roger W. Sant, Barry J. Sharp (collectively,"Individual Defendants"), and AES Corporation, Motion for Judgment on the Pleadings.  All of plaintiffs', Donald O. Stafford, Marie L. Olson, Robert P. Courtney, Myron Clark, and Russell Chorpenning, claims are hereby **DISMISSED** with prejudice. Each party to bear its own costs.

IT IS SO ORDERED this 7th day of July, 2005.

LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

10

Electronically distributed to:

Thomas George Ciarlone Jr.
SHALOV STONE & BONNER LLP
tciarlone@lawssb.com

Peter B. Morrison
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
pmorriso@skadden.com

David J. Cutshaw
COHEN & MALAD LLP
dcutshaw@cohenandmalad.com

Richard E. Shevitz
COHEN & MALAD LLP
rshevitz@cohenandmalad.com

James H. Ham III
BAKER & DANIELS
jhham@bakerd.com

Olimpio Lee Squitieri
SQUITIERI & FEARON LLP
lee@sfclasslaw.com

Samuel Kadet
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
skadet@skadden.com

Ralph Meyer Stone
SHALOV STONE & BONNER LLP
rstone@lawssb.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Paul A. Wolfla
BAKER & DANIELS
paul.wolfla@bakerd.com

Catherine A. Meeker
BAKER & DANIELS
cameeker@bakerd.com

11